UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

STEPHEN M. GLASSER, Regional Director
of the Seventh Region of the National Labor
Relations Board, for and on behalf of the
NATIONAL LABOR RELATIONS BOARD,

                    Petitioner,               CASE NUMBER: 09-10721
                                               HONORABLE VICTORIA A. ROBERTS

v.

HEARTLAND - UNIVERSITY OF
LIVONIA, MI, LLC, d/b/a HEARTLAND
HEALTH CARE CENTER - UNIVERSITY,

                    Respondent.
_____/

## ORDER:
## (1) GRANTING PETITION FOR PRELIMINARY INJUNCTION UNDER SECTION 10(J) OF THE NATIONAL LABOR RELATIONS ACT;
## (2) DENYING RESPONDENT'S MOTION TO DISMISS FOR LACK OF SUBJECT MATTER JURISDICTION; AND
## (3) DECLARING MOOT RESPONDENT'S MOTION TO STRIKE PORTIONS OF AFFIDAVIT

I.     **INTRODUCTION**

        Petitioner seeks a preliminary injunction pursuant to section 10(j) of the National

Labor Relations Act ("NLRA"), as amended, 29 U.S.C. § 160(j).  The Court heard

argument on March 31, 2009.  The Court **GRANTS** Petitioner's request and will enter a

Preliminary Injunction of limited duration.

        Additionally, Respondent moved to dismiss the Petition for lack of subject matter

jurisdiction (Doc. #10), on grounds that it was authorized by the General Counsel for the

National Labor Relations Board, and not the Board itself.  The Court **DENIES** that

request and joins other districts in holding that § 3(d) of the NLRA, 29 U.S.C. § 153(d),

allows the Board to delegate its § 10(j) authority to the General Counsel.  *See Muffley v. Massey Energy Co.*, 547 F. Supp. 2d 536, 540-42 (S.D.W. Va. 2008), *appeal docketed*, No. 08-2067 (4th Cir. Sept. 18, 2008); *Kentov v. Point Blank Body Armor, Inc.*, 258 F. Supp. 2d 1325, 1327-29 (S.D. Fla. 2002); *Penello v. Int'l Union, United Mine Workers*, 88 F. Supp. 935, 937 (D.D.C. 1950); *Madden v. Int'l Union, United Mine Workers of Am.*, 79 F. Supp. 616, 617 (D.D.C. 1948); *Evans v. Int'l Typographical Union*, 76 F. Supp. 881, 886-89 (D. Ind. 1948).  The Court maintains jurisdiction over the parties and subject matter pursuant to 28 U.S.C. §§ 1331 and 1345, and 29 U.S.C. § 160(j).

Respondent also filed a motion to strike portions of the affidavit of Marcella Clarke, filed in support of the Petition, as inadmissible hearsay (Doc. #11).  For reasons explained below, that motion is MOOT.

## II.    BACKGROUND

The facts as summarized are taken from the Petition for Preliminary Injunction and the decision of the administrative law tribunal issued on December 22, 2008 ("ALJ Decision").

### A.    Uncontested Facts

Respondent Heartland - University of Livonia, Michigan, LLC, operates a nursing home in Livonia, Michigan.  Since 1988, SEIU Healthcare Michigan ("the Union") is the exclusive collective bargaining representative for Heartland's regular full- and part-time nurse aids, dietary, maintenance and housekeeping employees ("the Unit").  Over the years, Heartland and the Union entered into several collective bargaining agreements ("CBAs").  The most recent CBA ran from May 2004 until April 30, 2007.  Upon its

2

expiration, the parties engaged in negotiations, which were still in process when the events giving rise to this Petition occurred.

In November 2007, an employee by the name of Shari Parks circulated a petition stating that the employees who signed it no longer wanted to be part of the Union ("Decertification Petition").  The Decertification Petition collected 26 signatures, and Ms. Parks submitted it to the National Labor Relations Board ("NLRB" or "the Board") on December 6, in support of a formal petition to decertify the Union.  Petitioner does not claim Heartland engaged in any unfair labor practices in connection with the Decertification Petition.

On January 14, 2008, Ms. Parks started soliciting signatures for a second petition ("Disaffection Petition"); this effort garnered 13 signatures.  Instead of submitting it to the NLRB, like the Decertification Petition, Ms. Parks gave the Disaffection Petition directly to Heartland on January 17.  Together, the Decertification and Disaffection petitions contained 39 valid signatures, a slim majority of the Unit's 77 employees.

On January 17, within hours of receiving the Disaffection Petition, Heartland withdrew recognition from the Union, citing the petitions as objective evidence that a majority of Unit employees no longer supported the Union.  A week later, on January 23, Heartland increased the Unit's hourly wages by 50 cents, and gave employees a retroactive raise of 32 cents per hour, applicable from the expiration date of the last CBA.  In April 2008, Heartland gave Unit employees another 50 cent per hour raise.

On January 24, the Union filed a charge with the NLRB, accusing Heartland of violating section 8(a)(1) and (5) of the National Labor Relations Act ("the NLRA" or "the Act").  These provisions make it an unfair labor practice for an employer to -

3

> (1) interfere with, restrain, or coerce employees in the exercise of the
> rights guaranteed in section 7 [of the Act, 29 U.S.C. § 157];
> . . . [and]
> (5) refuse to bargain collectively with the representatives of his employees
> . . .

29 U.S.C. § 158(a)(1), (5).  The Union alleged, *inter alia*, that Heartland violated the

NLRA by: (1) interrogating employees about their union sympathies; (2) soliciting them

to sign a petition to decertify the Union; (3) threatening adverse action if they engaged

in protected activity;  and (4) unlawfully withdrawing recognition from the Union.

Petitioner Stephen M. Glasser investigated the complaint in his capacity as

Regional Director of the Seventh Region of the NLRB.  He found reasonable cause to

believe the Act had been violated, and issued a Complaint and Notice of Hearing on

April 30.

The hearing took place on June 24 and 25 before Administrative Law Judge Paul

Bogas ("the ALJ").  From the transcripts provided, the Court summarizes relevant

testimony from the hearing.

### B.    Administrative Law Hearing Testimony

Beverly Scott, an employee in Heartland's housekeeping department, testified

that on January 16, 2008, her supervisor, Cindy Lord, summoned Ms. Scott to Ms.

Lord's office using Heartland's public address system.  Ms. Scott said that when she

arrived, Ms. Lord paced outside her office, and said someone inside wanted to see her.

Ms. Scott entered and found Ms. Parks, who made a few general comments about the

Union and said: "You already know what's going on."  Ms. Scott said yes, and added:

"Before you start or say anything to me, I'm with the Union 100 percent," to which Ms.

4

Parks responded: "Don't tell nobody about this conversation because if you do your job

will be terminated."  (Pet. Ex. 2, Transcript of Administrative Hearing (June 24, 2008)

(hereinafter Hr'g Tr.), at 65.)   Ms. Scott testified that, during this exchange, Ms. Lord

continued pacing outside of the office.  A few days later, Ms. Scott related this

conversation to Teresa Stephens, Heartland's Human Resource Manager, who took

notes and said no employee could threaten Ms. Scott's job.  Ms. Stephens indicated

she would "get back" to Ms. Scott, but never did.  Ms. Scott did not sign the Disaffection

Petition.

Another employee, William Brazil, testified that in early January, Ms. Lord told

him someone in the front office wanted to see him.   Mr. Brazil went to the office of the

Director of Nursing, where he met a young woman whose name he did not know.  Mr.

Brazil testified he had seen the woman circulating petitions against the Union, and that

she attended the administrative hearing on the same day he did.  From this description,

the ALJ inferred the person was Ms. Parks.  The woman spoke to Mr. Brazil about the

Union, and sent him to Glen Lowery, Heartland's Administrator at the time.   Mr. Brazil

testified that, when he went into Mr. Lowery's office,

> Glen had talked to me about how do I feel about the Union; was I for the
> Union or was I against the Union.  He told me that he needed about two
> more signatures in order to get the Union out.  He asked me would I sign
> to help get the Union out.  I told him I didn't, I wasn't for the Union; I wasn't
> against the Union.  I didn't want to give him my opinion as to how I felt
> about the Union.  . . .
> He asked me would I help him to get the Union out because the Union had
> been around, he was tired of the Union. He said if I help get the Union out
> he would have more control within the company.

(*Id.* at 74-75.)  Mr. Brazil added that Ms. Lord called him back to Mr. Lowery's office

"about two or three times."  On each occasion Mr. Lowery asked him if he had made a
decision about "voting the Union out or keeping it in."  (*Id.* at 75-76.)  Each time, Mr.
Brazil answered he had not made any decision.  After the last encounter, Mr. Lowery
told Mr. Brazil to go back to the Director of Nursing's office, where he met the same
woman as before.  Mr. Brazil testified that she told him: "either way it go [sic], with or
without your vote, we don't need it; we have enough signatures to vote the Union out."
(*Id.* at 76.)  Mr. Brazil did not sign the Disaffection Petition.

### C.    December 22, 2008 Findings of the Administrative Law Judge

The ALJ credited the statements of Ms. Scott and Mr. Brazil over the testimony of
Ms. Parks and Mr. Lowery.  And, he found that Ms. Parks acted as Heartland's agent
when she threatened Ms. Scott.

The ALJ held that Heartland violated § 8(a)(1) of the Act by: (1) actively soliciting
and helping to solicit employees to sign a decertification petition (actually, the
Disaffection Petition); (2) coercively interrogating Mr. Brazil about his union sympathies
and willingness to sign the Disaffection Petition; and (3) threatening Ms. Scott with
adverse action if she engaged in protected concerted activities.  Lastly, the ALJ ruled
that Heartland violated § 8(a)(1) and (5) by withdrawing recognition from the Union
based on a Disaffection Petition tainted by its own misconduct, and by unilaterally
implementing wage increases for Unit employees.

Heartland filed exceptions to this ruling, and the matter is before the Board for
review.

### D.    Petitioner's Request for Injunctive Relief

At the administrative hearing, Petitioner stated his intent to seek authorization from the Board to petition this Court for temporary injunctive relief pursuant to § 10(j) of the NLRA, 29 U.S.C. § 160(j).  Petitioner indicated then that he would not wait for the ALJ's decision, but would proceed based on the record of the hearing.  At oral argument, Petitioner stated he decided to postpone his request until the ALJ rendered its decision.

Petitioner received authorization to seek § 10(j) relief on February 23, 2009, and filed this Petition three days later.  Petitioner asks the Court to enjoin Heartland from: (1) refusing to recognize the Union; and (2) unilaterally implementing wage increases or changes to the terms of employment of Unit employees.  In addition, Petitioner requests that the Court order Heartland to (1) recognize and bargain with the Union in good faith; (2) post copies of the Court's order in its facility; and (3) provide sworn affidavits to the Regional Director describing steps taken to comply with the injunction.

## III.   APPLICABLE LAW

Typically, labor disputes are adjudicated by way of administrative proceedings before the NLRB, subject to review – and enforcement, if necessary – by the proper court of appeals.  *See Kobell v. United Paperworkers Int'l Union*, 965 F.2d 1401, 1406 (6th Cir. 1992).  The Board's review process is "notoriously glacial," however.  *Kinney v. Pioneer Press*, 881 F.2d 485, 491 (7th Cir. 1989) (*quoting Boire v. Int'l Bhd. of Teamsters*, 479 F.2d 778, 788 (5th Cir. 1973)).

To address this problem, Congress enacted NLRA § 10(j), which allows the NLRB to seek a temporary injunction to prevent allegedly unfair labor practices from continuing during the pendency of a case.  *Calatrello v. "Automatic" Sprinkler Corp. of*

7

*Am.*, 55 F.3d 208, 212 (6th Cir. 1995) (*citing United Paperworkers*, 965 F.2d at 1406).

Section 10(j) provides:

> The Board shall have power, upon issuance of a complaint . . . charging that any person has engaged in or is engaging in an unfair labor practice, to petition any [U.S.] district court . . . for appropriate temporary relief or restraining order.  Upon the filing of any such petition the court . . . shall have jurisdiction to grant to the Board such temporary relief or restraining order as it deems just and proper.

29 U.S.C. § 160(j).  Courts and practitioners generally refer to this provision as § 10(j),

for its placement in the NLRA, not for its location in the United States Code.

Section 10(j) proceedings are "merely ancillary" to the NLRB's adjudication of

underlying unfair labor practice claims, and district courts "are *not* to adjudicate the

merits of the unfair labor practice case."  *Fleischut v. Nixon Detroit Diesel*, 859 F.2d 26,

28 (6th Cir. 1988) (emphasis in original).

Circuits do not agree on the proper standard for review of § 10(j) petitions.  *See*

*Schaub v. Detroit Newspaper Agency*, 984 F. Supp. 1048, 1051-52 (E.D. Mich. 1997)

(reviewing cases).  Courts in the Sixth Circuit will grant a § 10(j) petition only if: (1) there

is "reasonable cause" to believe the alleged unfair labor practices occurred; and (2)

injunctive relief is "just and proper."  *Nixon Detroit Diesel*, 859 F.2d at 29; *"Automatic"*

*Sprinkler*, 55 F.3d at 212.  The petitioner bears the burden of proof on both steps of the

analysis.

The "reasonable cause" analysis is divided into two subsections.  *United*

*Paperworkers*, 965 F.2d at 1406.  The first requires the court to assess whether the

petitioner articulates a sufficient legal theory upon which to obtain relief.  To satisfy his

burden,

8

> the [petitioner] must produce some evidence in support of the petition and
> "need not convince the court of the validity of the Board's theory of liability,
> as long as the theory is substantial and not frivolous."  This question is
> essentially one of law, and, in answering the question, a district court
> "need not concern itself with resolving conflicting evidence if facts exist
> which could support the Board's theory of liability."

*Id.* at 1406-07 (*quoting Gottfried v. Frankel*, 818 F.2d 485, 493 (6th Cir. 1987); *Nixon Detroit Diesel*, 859 F.2d at 29).  On appeal, the district court's ruling on this element is subject to *de novo* review.  *Gottfried v. Sheet Metal Workers' Int'l Ass'n., Local Union No. 80*, 927 F.2d 926, 927 (6th Cir. 1991).

The second subsection requires the court to determine whether the facts as found satisfy the petitioner's legal theory.  *United Paperworkers*, 965 F.2d at 1407; *"Automatic" Sprinkler*, 55 F.3d at 213.  Again, the district court's inquiry is limited to making sure the petitioner produces "some evidence" in support of the petition.  *Sheet Metal Workers*, 927 F.2d at 927.  This is "largely a factual question," and the district court's determination is reviewed for clear error.  *United Paperworkers*, 965 F.2d at 1407.

If the court finds reasonable cause to exist, its next task is to determine whether the requested relief is "just and proper."  *Id.* at 1406.  Again, the circuits do not agree on what analysis to apply.  *See Detroit Newspaper Agency*, 984 F. Supp. at 1052 (discussing cases).  The Sixth Circuit interprets the term "just and proper" as expressing Congress's belief that a less stringent standard applies to § 10(j) relief than to traditional preliminary injunctions.  *Nixon Detroit Diesel*, 859 F.2d at 30 n.3.

In considering whether injunctive relief is just and proper, "a district court must bear in mind that 'section 10(j) was added to give the Board a means of preserving the

9

status quo pending the completion of its regular procedures.'"  *Frankel*, 818 F.2d at 494

(*quoting Levine v. C & W Mining Co.*, 610 F.2d 432, 436 (6th Cir. 1979)).  Congress's

purpose in creating this remedy was to address cases where "the enforcement of a

Board order after the Board's normal processes is ineffective to undo the effects of

unfair labor practices."  *Nixon Detroit Diesel*, 859 F.2d at 30.  Thus,

> The primary concern under the just and proper inquiry "is whether such
> relief 'is necessary to return the parties to [the] status quo pending the
> Board's proceedings in order to protect the Board's remedial powers
> under the NLRA, and whether achieving [the] status quo is possible.'"
> [*Frye v. Specialty Envelope*, 10 F.3d 1221, 1226 (6th Cir. 1993)] (*quoting
> Frankel*, 818 F.2d at 495).  The status quo is the state of affairs existing
> before the alleged unfair labor practices took place.  *Id.*

*"Automatic" Sprinkler*, 55 F.3d at 214 (first two alterations in original).  The court must

decide if the circumstances of a case create a risk that the Board's final order will be

rendered meaningless, such that the public interest itself calls for an injunction to issue.

*See Nixon Detroit Diesel*, 859 F.2d at 30; *Sheeran v. Am. Commercial Lines, Inc.*, 683

F.2d 970, 979 (6th Cir. 1982).  The district court's finding on this prong is reviewed for

abuse of discretion.  *Nixon Detroit Diesel*, 859 F.2d at 30.

Because the district court's § 10(j) fact-finding responsibilities are limited, "a §

10(j) hearing is only a 'reasonable cause' hearing."  *Frankel*, 818 F.2d at 493.  As long

as it has enough evidence upon which to find reasonable cause that an unfair labor

practice occurred, the court need not hold a full evidentiary hearing on a § 10(j) petition,

and refusal to do so is reviewed for abuse of discretion.  *Id.*

The Court has a complete transcript of the ALJ proceedings and the parties'

exhibits, and concludes a full evidentiary hearing is unnecessary.  *See Glasser v.

Precision Gage*, No. 02-73753, 2003 U.S. Dist. LEXIS 12026, at *10 (E.D. Mich. Jan.

10

27, 2003) (unpublished) (no hearing necessary where the court had access to transcripts of witness testimony before the ALJ).

## IV.    ANALYSIS

### A.    Reasonable Cause

The burden to establish reasonable cause is "relatively insubstantial."  *Frankel*, 818 F.2d at 493.  The Board "need not prove that an unfair labor practice had occurred, but must only produce some evidence in support of the petition."  *Id.* (*citing C & W Mining*, 610 F.2d at 435).

### 1.    Sufficiency of the Board's Legal Theory

Petitioner's burden is met under this first prong if he can simply articulate a legal theory that is "substantial and not frivolous."  *Id.*   Heartland does not dispute that Petitioner satisfies this requirement.

Petitioner claims Heartland violated the NLRA by interfering with, restraining, or coercing employees in the exercise of their § 7 rights, and by refusing to bargain collectively with the Union.  29 U.S.C. § 158(a)(1), (5).

Section 7 safeguards the rights of employees to organize and bargain collectively with their employer:

> Employees shall have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection . . .

29 U.S.C. § 157.

Petitioner asserts that Heartland violated NLRA § 8(a)(1) and (5) by: (1) interrogating and threatening employees; (2) soliciting employees to withdraw their

11

support for the Union and sign the Disaffection Petition; (3) assisting in the gathering of signatures for the Disaffection Petition; (4) withdrawing recognition from the Union based on a tainted Disaffection Petition; and (5) unilaterally implementing wage increases for Unit employees.

Heartland concedes that, if proven, Petitioner's individual allegations constitute unfair labor practices, and that it could not rely on a Disaffection Petition secured unlawfully to stop recognizing the Union. Heartland urges, however, that Petitioner's allegations are simply insufficient to find the Disaffection Petition was tainted. This brings the Court to the second prong of the "reasonable cause" analysis.

## 2. Adequacy of Facts Alleged

To meet its "relatively insubstantial" evidentiary burden, "the Board does not have to prove . . . that unfair labor practices have occurred." *Frankel*, 818 F.2d at 493. Furthermore, in making its determination, the district court is "not supposed to resolve conflicts in the evidence," but only ascertain whether the regional director adduced "some evidence" in support of his petition. *Id.*

The Sixth Circuit upholds findings of fact by the ALJ and the Board if they are "supported by substantial evidence on the record." *Conley v. NLRB*, 520 F.3d 629, 638 (6th Cir. 2008) (*citing* 29 U.S.C. § 160(e), (f)). *See also NLRB v. General Fabrications Corp.*, 222 F.3d 218, 225 (6th Cir. 2000) ("Substantial evidence exists when, on the record as a whole, evidence is 'adequate, in a reasonable mind, to uphold the [Board's] decision.'") (*quoting Turnbull Cone Baking Co. v. NLRB*, 778 F.2d 292, 295 (6th Cir. 1985). Because the ALJ benefits from "the superior position of observing the witness' demeanor," *V & S ProGalv, Inc. v. NLRB*, 168 F.3d 270, 277 (6th Cir. 1999),

12

> "Deference to the Board's factual findings is particularly appropriate where the 'record is fraught with conflicting testimony and essential credibility determinations have been made.'"

*Conley*, 520 F.3d at 638 (*quoting Tony Scott Trucking, Inc. v. NLRB*, 821 F.2d 312, 315 (6th Cir. 1987) (internal quotation omitted)).

Petitioner argues that by, *inter alia*, questioning employees about their allegiance to the Union and soliciting signatures to decertify it, Heartland fatally deprived the Disaffection Petition of its character as a true reflection of employee free will.  Thus, Petitioner contends, the Disaffection Petition cannot serve as an objective basis for Heartland to withdraw recognition.

The crux of Petitioner's argument is that Heartland's illegal conduct "tainted" the Disaffection Petition and rendered it invalid.  The NLRB has long held that:

> Where an employer aids or supports employees in withdrawing from a union or otherwise manifesting their disaffection with an incumbent representative, . . . the evidence of withdrawal or disaffection thus procured by the employer cannot serve as the requisite objective basis upon which a lawful withdrawal of recognition must be predicated.

*Tyson Foods*, 311 N.L.R.B. 552, 556 (1993).  *See also Columbia Portland Cement Co. v. NLRB*, 979 F.2d 460, 464 (6th Cir. 1992) (approving the Board's determination that an employer could not rely on a tainted petition for decertification).

Not all forms of employer assistance will fatally taint an otherwise viable petition.  Indeed, the NLRB distinguishes between clerical, or otherwise minimal help, and facts that clearly reflect an employer's excessive involvement in the petitioning process:

> an employer is permitted to provide ministerial aid to an employee who has decided of his or her own volition to file a decertification petition, but violates the Act by actively soliciting, encouraging, promoting or providing assistance in the initiation, signing or filing of such a petition.

13

*Bridgestone/Firestone, Inc.*, 335 N.L.R.B. 941, 948 (2001) (citing cases).

"There is no bright line test with which to distinguish unlawful assistance from mere ministerial aid." *The Fresno Bee*, 337 N.L.R.B. 1161, 1178 (2002) (footnote omitted). Instead, "the essential inquiry is whether 'the preparation, circulation, and signing of the petition constituted the free and uncoerced act of the employees concerned.'" *Eastern States Optical Co.*, 275 N.L.R.B. 371, 372 (1985) (*quoting KONO-TV-Mission Telecasting*, 163 N.L.R.B. 1005, 1006 (1967)).

Heartland argues that any assistance Ms. Parks received on the Disaffection Petition was "minimal and ineffective," and does not amount to excessive involvement. First, Heartland notes, Petitioner does not contend Ms. Parks received help for the December 2007 Decertification Petition. Second, there is no evidence that any signature on the Disaffection Petition was coerced, or obtained with Heartland's assistance: only two individuals, Ms. Scott and Mr. Brazil, testified to unlawful practices regarding the Disaffection Petition, and neither signed it. Heartland contends that, even if these allegations are true, failed attempts at gathering signatures cannot establish reasonable cause.

Petitioner counters that whether Heartland actually succeeded in obtaining signatures is irrelevant. Instead, Petitioner argues, reasonable cause is established by showing that Heartland unlawfully assisted Ms. Parks, solicited signatures for the Disaffection Petition, and interrogated employees about union sympathies.

To support his argument, Petitioner relies on *SFO Good-Nite Inn*, in which three workers were solicited by their employer to sign a decertification petition, but refused. 350 N.L.R.B. No. 42, 2008 NLRB LEXIS 76, at *1-2 (2008). Another employee agreed

14

to sign in exchange for the employer approving his vacation request; by then, however, a majority of workers had already joined the petition, and the employer had already withdrawn recognition from the union. *Id.* at *2. Therefore, none of the employees for whom there was evidence of unlawful solicitation actually signed the petition before it reached the majority necessary to withdraw recognition. The employer also engaged in other unfair labor practices; it told one worker she could be discharged for telling others not to sign the petition, and it fired two of the workers who refused to sign. *Id.*

The Board held that by soliciting signatures for the petition, making threats and promises to get employees to sign, and threatening to fire someone for opposing the effort, the employer directly tainted the petition, and could not rely upon it to withdraw recognition from the union. *Id.* at *5. The employer argued there was no evidence that employees who signed the petition were coerced to do so, or that they were aware of any unlawful conduct, and therefore the petition should remain valid. *Id.* The Board rejected this argument, stating that because the employer's actions were "aimed specifically at causing employee disaffection with their union," the petition was tainted even though signatory employees were unaware of the unlawful conduct. *Id.* (*quoting Hearst Corp.*, 281 N.L.R.B. 764 (1986)).

Heartland responds that *SFO Good-Nite Inn* is inapposite, because (1) any assistance Ms. Parks received was minimal and ineffective by comparison; and (2) Heartland's actions were not aimed specifically at causing employee disaffection with the Union.

The Court finds Heartland's arguments unavailing. First, in assessing the lawfulness of Heartland's conduct, the benchmark is not whether it reaches the levels of

15

*SFO Good-Nite Inn*, but how Heartland's actions compare to other types of activities the Board has found to be permissible or impermissible.

It is permissible for an employer to respond to questions by employees about decertifying a union, supply lists of employee names to a decertification committee, allow a decertification petition to circulate during work hours and even provide language for the petition.  *See KONO-TV-Mission Telecasting Corp.*, 163 N.L.R.B. at 1006; *Consol. Rebuilders, Inc.*, 171 N.L.R.B. 1415, 1417 (1968); *Walter Garson, Jr. & Assocs.*, 276 N.L.R.B. 1226, 1241-42 (1985); *Ernst Home Ctrs., Inc.*, 308 N.L.R.B. 848, 848 (1992).

On the other hand - on the side of impermissible conduct - the Board unequivocally holds:

> it is unlawful for an employer to initiate a decertification petition, solicit signatures for the petition, or lend more than minimal support and approval to the securing of signatures and the filing of the petition.  In addition, . . . [the employer's] actions must occur in a "situational context free of coercive conduct."

*Eastern States Optical Co.*, 275 N.L.R.B. 371, 372 (1985) (*quoting KONO-TV*, 163 N.L.R.B. at 1006) (other footnotes omitted).

There is ample evidence to support a finding that Heartland's actions crossed the line from ministerial and minimal, to active solicitation, encouragement and promotion against the Union.  The ALJ found that: Ms. Lord, a company supervisor, summoned two employees, Ms. Scott and Mr. Brazil, sometimes by using the public address system; Ms. Scott and Mr. Brazil met with Ms. Parks, Heartland's agent; Ms. Parks used a management office to gather signatures for a decertification petition; Ms. Parks threatened Ms. Scott with termination if she reported their conversation; Mr. Lowery,

16

Administrator for Heartland, questioned Mr. Brazil about his feelings for the Union on two or three separate occasions; Mr. Lowery told Mr. Brazil that without the Union, he would have more control within the company; and Mr. Lowery asked Mr. Brazil to sign the Disaffection Petition.

These actions, if true, go "far beyond the 'ministerial aid' of a petition permitted by the Act." *SFO Good-Nite Inn*, 2008 NLRB LEXIS 76, at *4.

Heartland also contends that *SFO Good-Nite Inn* is inapposite because the Board's ruling hinged upon finding that the employer's conduct was "aimed specifically at causing employee disaffection with their union." *Id.* at *5. At oral argument, Heartland suggested that *SFO Good-Nite Inn* is a progeny of the Board's ruling in *Master Slack Corp.*, 271 N.L.R.B. 78 (1984). Under the *Master Slack* theory, an employer who engages in unlawful conduct aimed at eroding union support among employees, and whose actions have at least a "meaningful impact" on employee disaffection for the union, cannot later cite the union's loss of majority status as grounds to withdraw recognition. *Pleasantview Nursing Home, Inc. v. NLRB*, 351 F.3d 747, 764 (6th Cir. 2003) (*quoting Master Slack*, 271 N.L.R.B. at 84 (internal quotation omitted)).

Heartland argues that, to establish reasonable cause under *SFO Good-Nite Inn*, Petitioner must show not only excessive involvement in the petitioning process, but also that Heartland's conduct was specifically aimed at causing employee disaffection with the Union. But, Petitioner's only legal theory here is that the described conduct by Heartland fatally tainted the Disaffection Petition. He does not contend at all, that Heartland's conduct was specifically aimed at causing employee disaffection. And, the ALJ did not find evidence of conduct aimed. Nonetheless, Heartland says, the facts do

17

not support finding reasonable cause under *SFO Good-Nite Inn*.

Heartland's argument misapprehends Board law; *SFO Good-Nite Inn* does not require a dual finding of excessive involvement and conduct aimed at causing employee disaffection, nor was its ruling of excessive involvement contingent upon finding that the employer sought to cause employee disaffection.  After summarizing the applicable law, the Board stated:

> Here, . . . the Respondent unlawfully assisted an antiunion petition. General Manager Chaudhry solicited employees Valencia and Maldonado to sign the petition; Assistant Manager Aquino encouraged employee Taloma to sign, accompanied by threats and promises; and Chaudhry and coowner Yokeno threatened employee Contreras with discharge for opposing the petition.  The Respondent is precluded from relying on the petition, tainted by *these unfair labor practices*, as a basis for withdrawing recognition from the Union.  *Hearst Corp.*, [281 N.L.R.B. 764 (1986)]; [other citations omitted].

> The Respondent contends that the petition was not tainted by its unfair labor practices because there is no evidence that the employees who signed it knew of the unlawful conduct.  But the Board specifically rejected this contention in *Hearst Corp.*, supra.  There, 17 of 33 petition signers affirmatively testified that they were unaware of the employer's unlawful conduct.  This evidence was insufficient to meet the employer's "burden of showing that the petition was untainted," however, because the unfair labor practices were "aimed specifically at causing employee disaffection with their union" and included suggesting to employees that they sign the petitions and urging employees to persuade their coworkers to withdraw their support for the union.  [*Id.* at 764-65].  Unfair labor practices of this character, which are also present here, will taint a decertification petition "notwithstanding that some employees may profess ignorance of their employer's misconduct."  *Id.* at 765.

*SFO Good-Nite Inn*, 2008 NLRB LEXIS 76, at *5 (emphasis added) (footnote omitted).

As this excerpt clearly shows, the Board concluded the petition was tainted before it even considered whether the employer's conduct contributed to eroding employee support.  In fact, the discussion of conduct aimed appears to be an afterthought, to

18

rebut the employer's argument that the petition should be valid because employees who signed it were not aware of unlawful acts.

Critical to this Court's finding here, is that the actions upon which the Board based its ruling in *SFO Good-Nite Inn* – soliciting employee signatures, making threats and promises, threatening an employee for opposing the petition – are almost identical to those alleged by Petitioner.

The Court also rejects Heartland's contention that *SFO Good-Nite Inn* is a *Master Slack* case.  Under *Master Slack*, the petitioner must show that the union's loss of majority status is causally connected to the employer's unfair labor practices before the Board will invalidate an employer's withdrawal of recognition.  271 N.L.R.B. at 84 (*citing Deblin Mfg. Corp.*, 208 N.L.R.B. 392, 402 (1974)).  However, that causal connection was not the focus in *SFO Good-Nite Inn* and, in fact, it was entirely absent from the Board's decision.  The Board mentions *Master Slack* only once, after holding that the employer improperly withdrew recognition.  That is in a footnote: "We therefore find it unnecessary to pass on the judge's finding that the petition was tainted under the standards set forth in *Master Slack Corp.*"  *Id.* at n.11.  This is clear evidence that *SFO Good-Nite Inn* stands independent from *Master Slack*.  If *SFO Good-Nite Inn* required a showing of intent to erode employee support for the Union, as Heartland suggests, the Board would not have taken care to differentiate its analysis from *Master Slack* in this way.

Finally, the Court notes this other footnote, by one of the two Board Members who decided *SFO Good-Nite Inn*:

Member Schaumber acknowledges that *Hearst Corp.* is extant Board law

19

and applies it for the purpose of deciding this case.  In his view, even
unfair labor practices such as those in this case might not taint a petition if
there was *affirmative evidence that a majority of unit employees both
signed the petition and were unaffected by the unlawful conduct.*  As noted
above, however, there was no such showing in this case.

*Id.* at *5 n.10 (emphasis added).  Heartland fails to provide affirmative evidence that

would tend to show that the bare majority of employees who signed the Disaffection

Petition were unaffected by Heartland's actions.  The Court is confident that reasonable

cause exists under *SFO Good-Nite Inn*.

Heartland's last argument is that, instead of *SFO Good-Nite Inn*, the Court should

apply *Pacific Grove Convalescent Hospital*, 250 N.L.R.B. No. 48, 2007 NLRB LEXIS

307 (2007).  In *Pacific Grove*, an employee organized a decertification petition, gathered

signatures from 25 of the company's 43 employees, and received commitments to sign

from two others.  *Id.* at *14.  The employee handed the petition to the company's

administrator and asked him to obtain the signatures of the two remaining employees,

which he did.  *Id.*  The Board found that the administrator violated the NLRA by

gathering signatures, but held that since a majority of employees had already signed the

petition before he received it, the petition was not tainted by his actions.  *Id.* at *19-20.

This argument is unavailing as well.  There is a crucial difference between this

case and *Pacific Grove*.  In *Pacific Grove*, the unlawful act took place *after* a majority of

employees signed the petition.  The facts here clearly indicate that unfair labor practices

occurred *before* Ms. Parks obtained a majority of signatures.  Ms. Scott was certain that

her meeting with Ms. Parks took place on January 16, 2008, the day before Heartland

received the Disaffection Petition.  In addition, Mr. Brazil testified that, when Mr. Lowery

first questioned him, Mr. Lowery said "he needed about two more signatures in order to

20

get the Union out."  (Hr'g Tr. 74.)  After he met with Mr. Lowery for the last time, the woman whom the ALJ presumed to be Ms. Parks told Mr. Brazil: "with or without your vote, we don't need it; we have enough signatures to vote the Union out."  (*Id.* at 76.) This is enough to reasonably infer that Heartland's unlawful conduct took place before the Disaffection Petition gathered enough signatures to constitute a majority of Unit employees.

Under the standards articulated by the Board in *SFO Good-Nite Inn*, the Court holds that Petitioner met his burden.  There is reasonable cause to believe Heartland committed unfair labor practices.  The final inquiry is whether injunctive relief is just and proper.

### B.    Just and Proper Relief

Petitioner argues that unless the Court grants injunctive relief, the injury caused to the Union by Heartland's actions could be fatal.  Heartland responds that the Board's powers are sufficient to remedy any harm the Union allegedly suffered, and that Petitioner's delay in filing the Petition shows an injunction is not truly necessary.

In proceeding with the "just and proper" inquiry, a district court must be mindful that:

> "the relief to be granted is only that reasonably necessary to preserve the ultimate remedial power of the Board and is not to be a substitute for the exercise of that power."  Where the Board's remedial powers would be ineffective without a court order temporarily returning the protagonists to the positions they occupied before occurrence of the alleged unfair labor practice, the district court normally has discretion to issue such an order.

*Schaub v. Detroit Newspaper Agency*, 154 F.3d 276, 279 (6th Cir. 1998) (*quoting Frankel*, 818 F.2d at 494) (footnote omitted).  The Sixth Circuit also observed:

21

the appropriate focus is on whether it is necessary to return the parties to status quo pending the Board's proceedings in order to protect the Board's remedial powers under the NLRA, and whether achieving status quo is possible.

*Frankel*, 818 F.2d at 495.

### 1. Whether Injunctive Relief is Necessary to Preserve the Board's Remedial Power

Petitioner argues that Heartland's withdrawal of recognition has already caused the Union significant harm, and that injunctive relief is necessary to prevent further erosion of the Union's support among employees. In support, Petitioner submits an affidavit signed by Marcella Clark, an organizer working for the Union. (Pet. Ex. 7, Affidavit of Marcella Clark (Feb. 24, 2009).) Ms. Clark explains that when the Union received notice that the Decertification Petition was circulating at Heartland's facility, she attended a series of monthly off-site meetings to help employees organize against the Petition. She states that about 25 to 36 employees attended one meeting which took place "between the time the decertification petition started circulating . . . and [Heartland's] withdrawal of recognition." (*Id.* at 1-2.) Although the Union has continued to hold monthly meetings since losing recognition, Ms. Clark asserts the number of attendees has dwindled: 13 employees attended a gathering on January 7, 2009, and "only about six" people showed up at another meeting on January 26. (*Id.* at 3-4.)

Heartland seeks to strike portions of Ms. Clark's affidavit on hearsay grounds, but does not object to statements pertaining to the number of employees who attended the Union's monthly meetings. Because the Court relies only upon sections to which Heartland does not object, the motion to strike portions of the affidavit is moot.

Heartland also claims an injunction is not necessary to preserve the Board's

22

remedial powers.  Heartland reasons that if the Board affirms the ALJ's decision, it will order the parties to bargain together for a minimum reasonable period of six months, and possibly as long as 12 months.  According to Heartland, this remedy not only makes reaching an agreement very likely, it also ensures that a union unjustly deprived of recognition will recuperate any support lost in the intervening period, thus returning the Union to its original position.  Heartland submits that no injunction is necessary to preserve such broad remedial powers.

If the Board's remedies were as effective as Heartland portrays them to be, there would never be a need for § 10(j) relief.  Yet, Congress passed § 10(j) upon finding that, contrary to Heartland's suggestion, the Board's remedial powers are not always sufficient to overcome the passage of time.  Congress clearly believes that temporarily restoring the status quo *ante* is critical in some cases to ensure that, if and when the parties return to the bargaining table, they may proceed from the same positions and with the same relative strengths as they had before the unlawful labor practice occurred. *See Bloedorn v. Francisco Foods, Inc.*, 276 F.3d 270, 299 (7th Cir. 2001) (stating that "the longer that the Union is kept out . . . , the less likely it is to be able to organize and represent those employees effectively if and when the Board orders the company to commence bargaining."); *Seeler v. Trading Port, Inc.*, 517 F.2d 33, 38 (2d Cir. 1975) ("when a union loses its majority as the result of employer unfair labor practices, it is essential not to freeze the present situation, but rather to 're-establish the conditions as they existed before the employer's unlawful campaign'") (*quoting NLRB v. Gissel Packing Co.*, 395 U.S. 575, 612 (1969)).

Heartland also argues that the Union is sufficiently large and established to

23

weather the period until the Board issues its final order, since it has over 55,000

members in Michigan.  Heartland cites the example of *Timmins v. Narricot Industries.,*

*L.P.*, in which employees were represented by the United Brotherhood of Carpenters

and Joiners of America Industrial Council since 1976.  567 F. Supp. 2d 835 (E.D. Va.

2008).  The court denied an injunction because the decertification effort originated with

employees dissatisfied with the union, and because this was "not a situation in which an

employer undermined support for a newly certified, fragile Union."  *Id.* at 846.  Heartland

notes that this policy accords with the Sixth Circuit's policy not to "consider the degree

of irreparable harm to the unions and employees in 10(j) determinations."  *"Automatic"*

*Sprinkler*, 55 F.3d at 214 n.5.

In some cases, injunctive relief can run counter to its stated purpose of restoring

the status quo.  That is not a risk here.  First, there are substantial differences between

the facts alleged here and in *Narricot Industries*.  In holding that injunctive relief was not

just and proper, the *Narricot Industries* court relied in good measure upon its finding

that,

> [clearly,] the decertification effort originated with Narricot employees,
> separate and apart, and well before, any involvement or unlawful conduct
> by Narricot.  It is also clear that support for the Union, both in the form of
> membership in the Union and support for Union representation generally,
> was waning prior to Narricot's unfair labor practices.

567 F. Supp. 2d at 846 (footnote omitted).  Since the court was unable to determine

how much of the petition was tainted by the employer's unlawful actions, the court

declined to grant the injunction: "revoking the decertification effort would neither serve

the remedial purposes of the Act nor properly restore the status quo."  *Id.* (citation

omitted).

24

No evidence is in this record that the Union had lost its favor among employees before Heartland withdrew recognition.  In *Narricot Industries*, at least six employees worked to circulate the decertification petition, which was signed by about 64% of employees.  Here, it appears only Ms. Parks actively sought to oust the Union; in fact, Heartland asserts that she initiated and circulated both petitions on her own. Furthermore, the total of signatures from both petitions amounts only to 50.6%, a bare majority of Unit employees.  There is no solid indication that the Union was in serious disfavor when Heartland withdrew recognition.

Ms. Clark's affidavit may not be conclusive evidence of the Union's erosion of status, but it does bolster Petitioner's assertion that, since losing recognition, the Union has lost support among Unit employees.  Furthermore, there is no indication that granting the injunction would risk "ensconcing the union as the employees' exclusive bargaining representative[, thereby] infringing upon employees' Section 7 rights." *Exxel/Atmos, Inc. v. NLRB*, 28 F.3d 1243, 1248 (D.C. Cir. 1994) (*quoted in Narricot Indus.*, 567 F. Supp. 2d at 846).

The Court holds that § 10(j) relief is justified and necessary to preserve the effectiveness of the Board's remedies.

### 2.    Petitioner's Delay in Seeking an Injunction

Heartland argues that Petitioner's delay in filing this Petition undermines his claim that interim relief is truly necessary.  Petitioner argues his delay is neither unreasonable nor excessive.

The Sixth Circuit holds that "delay is a permissible consideration in denying a section 10(j) petition, especially if the harm has already occurred and the parties cannot

25

be returned to status quo." *Frankel*, 818 F.2d 495.  *See also Detroit Newspaper Agency*, 154 F.3d at 280 ("[t]he timing of a request for a temporary injunction under § 10(j) is by no means irrelevant to the question whether issuance of such an injunction would be just and proper.").  However, considerations of timing should not eclipse the essential question of "whether it is necessary to return the parties to status quo pending the Board's proceedings in order to protect the Board's remedial powers." *Frankel*, 818 F.2d 495.

This case began on April 30, 2008, with the filing of Petitioner's administrative complaint.  The ALJ hearing, at which Petitioner first announced his intent to seek § 10(j) relief, was held two months later, on June 24 and 25.  It took six months for the ALJ to issue its decision, on December 22, and another two months before the Petition was filed, on February 26, 2009.

Heartland asserts that Petitioner's decision to wait ten months before filing his petition raises serious questions about whether injunctive relief is really "just and proper."  Petitioner explains he decided to wait for the ALJ's decision because only he could make the credibility determinations necessary to resolve conflicts in witness testimony.

Petitioner's explanation is satisfactory.  There is no evidence that the ten-month hiatus was caused by administrative inefficiencies on Petitioner's part, or that the delay was intended to put Heartland at a disadvantage.  Petitioner no doubt understood that such a delay could factor against him in the "just and proper" part of the analysis, but he also knew that, if the ALJ's ruling was favorable, he would stand a better chance of obtaining the relief sought.  Given how much this case hinges on conflicting testimonies

26

and witness credibility, the Court finds Petitioner's concern both reasonable and justified. *See Hirsch v. Konig*, 895 F. Supp. 688, 697 (D.N.J. 1995) (holding that an 11-month delay was reasonable where "the Board wanted to satisfy itself that [another decision] was not going to dictate a contrary result in this case [and] was waiting for [the ALJ's] decision which would possibly obviate the need for the present legal and Board action and would provide a comprehensive factual compilation for future action.").

Petitioner met his burden under the "just and proper" prong of the analysis; § 10(j) relief is appropriate.

### D.    Time Period for Temporary Preliminary Injunction

Heartland requests that injunctive relief be limited in duration if granted by the Court, because such a restriction may motivate the Board to accelerate its review. *See Kaynard v. Mego Corp.*, 633 F.2d 1026, 1035 (2d Cir. 1980) (noting that "the issuance of a section 10(j) injunction diminishes whatever incentives for speed the General Counsel and the charging union might otherwise have had, since a considerable portion of the desired relief has already been obtained.").

The Sixth Circuit expresses no opinion on the appropriateness of temporal limitations on § 10(j) relief, and leaves the issue to the district courts' discretion.

In *Sheeran v. Am. Commercial Lines, Inc.*, the court directed a district court to consider whether to limit the duration of a § 10(j) injunction, noting that it should "take into consideration the particular circumstances of this case and especially the time required for the NLRB to resolve the underlying proceedings if the case were handled as expeditiously as possible." 683 F.2d 970, 981 (6th Cir. 1982).

The Court finds it appropriate to limit the duration of the injunction. Heartland

27

withdrew recognition a year ago, and the Court is loathe to delay final resolution any further than necessary.  At the same time, Heartland's prediction that a ruling should come by late April, or the end of June at the latest, seems overly optimistic.  Since January 2008, the Board has functioned with only two of its five Members, and the Court has no information on when it will return to full capacity.  For this reason, the Court limits the duration of its injunction to four months.

## V.      CONCLUSION

Petitioner established reasonable cause to find that Heartland's unilateral withdrawal of recognition from the Union was grounded on a Decertification Petition unlawfully tainted by excessive employer involvement, in violation of § 8(a)(1) and (5) of the National Labor Relations Act, 29 U.S.C. § 158(a)(1) and (5).  Relief in the form of a temporary injunction is just and proper to preserve the status quo for four months or until the Board can adjudicate the merits of the underlying case, whichever is sooner.  A separate Order will follow.

Nearing expiration of this Order, Petitioner may file a renewed petition for injunctive relief if the Board has not reached a resolution on Petitioner's Complaint, and if necessary to preserve the effectiveness of Board's remedial powers.

**IT IS ORDERED.**

S/Victoria A. Roberts
Victoria A. Roberts
United States District Judge

Dated:  April 7, 2009

28

The undersigned certifies that a copy of this document was served on the attorneys of record by electronic means or U.S. Mail on April 7, 2009.

s/Carol A. Pinegar
Deputy Clerk